Gary KOSTON, as the Legal Representative of his Daughter Jenna Koston, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–395V.

United States Claims Court.

June 20, 1991.

Curtis R. Webb, Twin Falls, Idaho, for petitioner.

Laura S. Radack, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

NETTESHEIM, Judge.

Petitioner Gary Koston ("petitioner"), as the legal representative of his minor daughter, Jenna Koston, filed a claim for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1–300aa–34 (1988), *as amended* by several public laws codified in 42 U.S.C.A. §§ 300aa–1—300aa–34 (West Supp.1991) ("the Act"). This case is before the court after argument on respondent's objections to a special master's award of compensation, prefatory to which the special master denied respondent's motion to amend its report and to present evidence concerning causation at the hearing on compensation.

## FACTS

The following facts appear in the record as undisputed. Jenna Koston was born December 31, 1983, in Riverside, California. The delivery reportedly was normal, without complications. At the age of three and one-half months, Jenna developed a seizure within approximately 12 hours after receiving her second diphtheria-pertussis-tetanus (DPT) vaccination. With a fever of 100.3 degrees, the seizure lasted 30 to 40 minutes during which her arms twitched, legs stiffened, and eyes rolled upward. Jenna's medical records state that she had no reaction to her first DPT injection. Subsequently, Jenna has experienced seizures that doctors have been unable to control through medication or diet. One such seizure occurred one day after the administration of a diptheria-tetanus vaccination and was accompanied by a fever of 101.4 degrees. The doctors originally believed that an onset of fever caused the seizures; however, Jenna has since run fevers without having a seizure.

On May 8, 1990, Jenna's father filed a petition seeking compensation under the Act. Special rules are applicable to petitions filed under the Act. RUSCC, Appendix J, Vaccine Rule 4(b) requires respondent to file a report within 90 days after the filing of the petition setting forth a full and complete statement of respondent's position as to why an award should or should not be granted. The report must contain respondent's medical analysis of petitioner's claims and also must present any legal arguments that respondent advances in opposition to the petition. After reviewing the medical records submitted by petitioner, respondent filed its Rule 4(b) report on August 6, 1990. This report concluded that causation by factors unrelated to the vaccine injection was not supported by a preponderance of the evidence submitted with the petition. Respondent therefore conceded the issue of causation and recommended that further proceedings be scheduled to determine the proper compensation to be awarded.

During a telephone status conference with Special Master Elizabeth E. Wright on August 14, 1990, respondent requested and received voluntary consent from petitioner that Jenna undergo an independent medical evaluation ("IME") solely to provide a basis for settlement. Respondent chose Dr. Doris Trauner of the University of California at San Diego ("U.C.S.D.") Medical Center to perform the IME. In her undated evaluation, Dr. Trauner gave her opinion that Jenna has a variant of Rett Syndrome. Appended to her explanation was an undated Addendum setting forth the basis for her diagnosis. The following manifestations, in Dr. Trauner's view, were consistent and typical of Rett Syndrome: (1) Jenna's repetitive midline hand movements consisting of clapping movements; (2) Jenna's autistic-like features; (3) Jenna's having developed normally until the age of one and one-half years after which she has shown some evidence of regression and a lack of normal progress; (4) Jenna's developing an abnormally small head since birth

and being thin despite adequate food intake; and (5) Jenna's gait showing a lack of ability to carry out familiar, purposeful movements in the absence of paralysis or other motor or sensory impairment and also showing signs of failure of muscular coordination. The medical information submitted by petitioner with his petition included a medical evaluation performed in October 1988 by Dr. Richard Haas, a consulting neurologist at U.C.S.D. Medical Center. Although Dr. Haas' evaluation mentioned Rett Syndrome as a possible cause of Jenna's condition, he closed the report by stating that he did not then notice any evidence of Rett Syndrome.

According to the special master's order of December 3, 1990, on October 2, 1990, respondent's counsel requested that the special master arrange an immediate status conference to discuss the new information disclosed from Dr. Trauner's IME of Jenna's condition.[1] During the status conference, respondent's counsel orally moved for leave to amend the Rule 4(b) report by withdrawing respondent's concession of causation. The special master gave the parties leave to brief the issue and scheduled the hearing on compensation for December 5–6, 1990, in San Diego, California. On October 18, 1990, respondent filed its motion for leave to amend the Rule 4 report.

In briefing the motion for leave to amend, respondent asserted that Dr. Trauner's IME, performed in good faith, constituted newly discovered evidence. In addition, respondent contended that petitioner had submitted outdated medical records and that due to the nature of the program, under which respondent relies on petitioner to provide all relevant information and discovery is limited, " 'it is inevitable that, on occasion, the respondent's position as to compensability in a particular case will change over time.' " *Koston v. Secretary of HHS*, No. 90–395V, slip op. at 5 (Cl.Ct.Spec.Master Dec. 3, 1990) (order denying leave to amend). Respondent argued that no undue delay or prejudice

would result to petitioner, and that in the future if respondent's Rule 4(b) report is to be considered " 'indelibly etched in stone,' " respondent will not as readily concede cases. *Id.* at 6. Lastly, respondent argued that Dr. Trauner's diagnosis precluded the special master from finding that there is not a preponderance of the evidence that Jenna's condition is due to factors unrelated to the administration of the DPT vaccine.

Petitioner responded that a grant of respondent's motion to amend would have prejudiced petitioner by both delaying the disposition of his claim and reducing the amount of recovery and also would have disadvantaged him in presenting the claim for compensation. Petitioner contended that respondent was given ample time to undertake a thorough analysis of Jenna's medical records and that he was entitled to rely on respondent's concession of entitlement. Finally, petitioner argued that respondent's proposed amendment asserting an alternate causation for Jenna's condition would be futile since the Act requires that any alternative cause must be of known causation and the cause of Rett Syndrome is unknown. 42 U.S.C. § 300aa–13(a)(2).

By order entered on December 3, 1990, the special master denied leave to amend. The special master noted that respondent was aware of the possibility that Rett Syndrome was the cause of Jenna's condition and that the medical records furnished to respondent revealed that Jenna had shown a symptom of the syndrome, specifically, losing previously acquired skills. The special master considered that respondent's counsel chose to ignore this information or was careless in her review of the case. The special master attributed undue delay to respondent, since respondent had the opportunity to inquire into Rett Syndrome before it filed its Rule 4(b) report and could have requested an automatic 30–day suspension under Vaccine Rule 9(a). (Vaccine Rule 9(a) contemplates that either party may present a motion, upon which after good cause shown, the special master may

---

1. In her motion for review, respondent's counsel states that she requested the status conference on October 1, 1990, but that it actually took place the next day on October 2, 1990.

suspend the proceedings for 30 days.) The special master stated that any prejudice should "inure to the detriment of the defendant," particularly where respondent delayed and had available an extension and also "where, as here, a diagnosis of Rett syndrome is neither confirmed nor a clear-cut alternative cause...." *Koston,* slip op. at 8–9 (footnotes omitted). The special master also found that petitioner may be substantially prejudiced by prolonging the proceedings to inquire into causation, given that pre-judgment medical expenses are not compensable. Finally, the special master emphasized that proceedings under the Act are to occur as expeditiously as possible.

The hearing on the issue of compensation was held as scheduled, and a supplemental hearing took place on December 12, 1990, to take the testimony of a final expert witness. At the outset the special master admonished respondent's counsel not to present any testimony or otherwise refer to Rett Syndrome during the hearing. The special master also granted petitioner's motion to remove any reference to Rett Syndrome from Dr. Trauner's IME. The special master entered a decision for petitioner on March 29, 1991, finding that petitioner had satisfied the Vaccine Act requirements and was entitled to compensation for future rehabilitation and care in the form of a one-time payment of $10,000.00 and an annuity.

On April 29, 1991, respondent moved for review by the Claims Court on the basis that the decision finding entitlement failed to consider all relevant evidence. According to respondent, the special master abused her discretion in not granting respondent leave to amend its Rule 4(b) report because no undue delay would have ensued or substantial prejudice inured to petitioner had respondent been allowed to try the issue of causation. Respondent also contends that Dr. Trauner's findings of symptoms consistent with a diagnosis of Rett Syndrome in the IME were unavailable from the medical records accompanying the petition and should constitute new evidence.

Petitioner responds that the special master acted within the discretion accorded the trier of fact in ruling on a motion to amend because the decision was reasonable. He also argues that Rett Syndrome is an idiopathic illness and, as such has been ruled out as a possible defense by the Act itself. Thus, according to petitioner, the special master did not abuse her discretion in refusing leave to introduce evidence that Rett Syndrome caused Jenna's condition, as the amendment would be futile.

## DISCUSSION

### 1. *Standard of review*

On review of a decision by a special master, the Claims Court is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law." 42 U.S.C.A. § 300aa–12(e)(2)(B).

The Supreme Court, in the context of reviewing a federal agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), explained that under the arbitrary and capricious standard a reviewing court must consider "whether the [federal agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (citing cases). "Although ... [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.*

The Federal Circuit, in the context of reviewing a district court's decision to quash a deposition subpoena, gave the following guidelines:

An abuse of discretion occurs when (1) the court's decision is "clearly unreasonable, arbitrary or fanciful" (*Northrop Corp.* [*v. McDonnell Douglas Corp.*], 751 F.2d [395] at 399 [D.C.Cir.1984]); (2) the decision is based on an erroneous conclusion of law (*Ariel* [*v. Jones*], 693 F.2d [1058] at 1060 [11th Cir.1982], citing *Premium Service Corp.* [*v. Sperry &*

*Hutchinson Co.*], 511 F.2d [225] at 229 [9th Cir.1975] ); (3) the court's findings are clearly erroneous (*Deitchman* [*v. E.R. Squibb & Sons, Inc.*], 740 F.2d [556] at 564 [7th Cir.1984] ); or (4) the record contains no evidence on which the district court rationally could have based its decision (*e.g., Ariel*, 693 F.2d at 1060). However, "[t]he phrase [abuse of discretion] means ... that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Kern v. TXO Production Corp.*, 738 F.2d 968, 970 (8th Cir.1984); *Dart Industries, Inc.* [*v. Westwood Chemical Co., Inc.*], 649 F.2d [646] at 648 [9th Cir.1980], citing *Premium Service Corp.*, 511 F.2d at 229.... "Such abuses ... [of discretion] must be unusual and exceptional; we will not substitute our judgment for that of the trial judge." 511 F.2d at 229 (citation omitted).

*Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed.Cir.1986); *see also Hyundai Electronics Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990) (explaining that the "touchstone" of arbitrary, capricious, and abuse of discretion standards of review is rationality—consideration of all relevant factors absent a clear error of judgment).

The rules governing vaccine proceedings, RUSCC, Appendix J, the "Vaccine Rules," do not set forth any guidelines for special masters when determining whether to grant a motion for leave to amend. Amended pleadings were not foreseen in the context of proceedings under the Act due to the requirement that the petitioner submit with the petition all records to support petitioner's claim. Similarly, respondent's Rule 4(b) report replaces the answer. Nonetheless, RUSCC 15(a) provides a standard for analyzing whether a motion for leave to amend should be granted. This rule mirrors in all material respects Fed. R.Civ.P. 15(a). These rules state in the pertinent part that "leave shall be freely given when justice so requires."

The United States Supreme Court in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), set forth criteria for determining whether a Fed.R.Civ.P. 15 motion for leave to amend should be granted. The grant or denial of an opportunity to amend pleadings is within the discretion of the trial court. Leave to amend should be freely given in the absence of any apparent or declared reason such as undue delay; repeated failure to cure deficiencies by amendments previously allowed; bad faith or dilatory motive on the part of the movant; undue prejudice to the opposing party by virtue of allowance of the amendment; and futility of the proposed amendment. 371 U.S. at 182, 83 S.Ct. at 230; *accord Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403–04 (Fed.Cir.1989); *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 666 (Fed.Cir.1986). In *Mitsui Foods* the Federal Circuit elaborated that the *apparent* futility of a proposed amendment can be a basis for denying leave to amend. 867 F.2d at 1404 (emphasis in original). In *Senza-Gel* the Federal Circuit stated: "The single most important factor is whether prejudice would result to the nonmovant." 803 F.2d at 666 (citation omitted). The court also may weigh in the movant's favor any prejudice that will arise from denial of leave to amend. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir.1981).

Fed.R.Civ.P. 15 "was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result." *United States v. Hougham*, 364 U.S. 310, 316, 81 S.Ct. 13, 18, 5 L.Ed.2d 8 (1960); *accord Intrepid v. Pollock*, 907 F.2d 1125, 1128 (Fed.Cir.1990). The Court held in *Hougham* that the district court erred in not permitting a Rule 15 amendment where no prejudice was shown and stated that such action "would subvert the basic purpose of the Rule." 364 U.S. at 317, 81 S.Ct. at 18. Delay and prejudice parallel each other. " '[T]he risk of substantial prejudice increases with the passage of time.' " *Tenneco Resins, Inc. v. Reeves Bros., Inc.*, 752 F.2d 630, 634 (Fed. Cir.1985) (quoting *6 Wright & Miller, Federal Practice & Procedure* § 1488, at 439 (1971)). Whether delay is intended to ha-

rass or causes any ascertainable prejudice are considerations for delay being " 'undue.' " *Moore v. City of Paducah,* 790 F.2d 557, 561 n. 2 (6th Cir.1986) (citations omitted). The court emphasized that the district court is required to determine the degree of prejudice to the opposing party before making a decision on whether to allow amendment. 790 F.2d at 561. The inability to secure witnesses caused by delay from the opposing party's having sought an amendment may be a basis for denying a motion for leave to amend. *Cornell & Co., Inc. v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 824 (3d Cir.1978). A proposed amendment that raises a new legal theory and requires additional research and analysis shortly before or during trial likely will be a basis for finding prejudice to the non-moving party. *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 510 (4th Cir.1986).

### 2. *Review of special master's discretionary determination*

■ The issue is whether the denial of leave to amend respondent's Rule 4(b) report constituted an abuse of discretion. The special master reasoned that the issue of Rett Syndrome was adequately identified in the medical records submitted with the petition and, therefore, could not be considered new evidence. The special master considered that granting respondent's motion for leave to amend would cause undue delay because respondent could have inquired into Rett Syndrome before it issued its Rule 4(b) report. The special master also found that petitioner would be substantially prejudiced by prolonging the proceedings given that pre-judgment medical expenses are not compensable.

Dr. Haas' October 18, 1988 letter regarding Jenna's condition stated, "There has been a question of possible Rett's syndrome." Dr. Haas closed the letter, "I do not today see any evidence of Rett syndrome." This letter apparently is the only mention of Rett Syndrome in Jenna's medical records provided to respondent with the petition for compensation. Although some symptoms consistent with Rett Syndrome are noted in the medical records, nothing in

these records sufficiently raises the issue whether Rett Syndrome was the cause of Jenna's condition such that respondent can be faulted for being careless or having chosen to ignore the evidence.

Dr. Haas' letter of October 18, 1988, stated that he had questioned Rett Syndrome as the cause of Jenna's condition, but respondent was not obligated to pursue this theory, without more. The evidence of record discloses that the symptomatology of Rett Syndrome is progressive; consequently, the appearance of symptoms consistent with a diagnosis of Rett Syndrome during Dr. Trauner's later examination does not bespeak a lack of attention to investigating Rett Syndrome. Dr. Trauner's IME, dated September 12, 1990, disclosed her opinion that Jenna suffers from a variant of Rett Syndrome. Respondent's counsel discussed Rett Syndrome with Dr. Trauner by telephone on September 27 and asked the special master on October 2 to arrange for an immediate status conference to discuss this new finding. Respondent's counsel promptly notified petitioner of this new information and, thus, did not delay once the existence of the new evidence was disclosed.

On October 2, 1990, when respondent's counsel made her motion for leave to amend, a hearing date on compensation had not yet been scheduled. The special master allowed the parties to brief the issue and set the hearing date for December 5–6, 1990. A two-month period elapsed from the date on which the initial oral motion was made and the date on which the hearing began. Petitioner had adequate time to prepare for the hearing had respondent's motion been granted and so conceded in argument before this court.

Jenna's pediatric neurologist, Dr. William J. Lewis, testified at the hearing on December 5–6, 1990, and presumably could have been available to testify at the same time on the issue of Rett Syndrome. During the two-day hearing, petitioner presented the testimony of Gary Koston; Jeanne C. Heyeric, Ed.D.; Dr. William Lewis; and Robert Wallace, C.P.A. Respondent presented the testimony of Michelle Ward, R.N., and Dr.

Doris Trauner. Betsy Morrison, a financial expert, testified at the supplemental hearing on December 12, 1990. The proceedings would not have been lengthened unduly by taking testimony concerning Rett Syndrome. Indeed, petitioner's counsel disclosed to this court at argument that he would have used Dr. Lewis, so neither party needed to call any additional witnesses.

That petitioner would have been required to present a case on the issue of liability does not constitute prejudice unless he could show some difficulty in obtaining witnesses or other evidence. Petitioner made no such showing. For its part respondent was willing to mitigate any delay. Respondent suggested before the special master that a second and decisive IME be performed as a means to resolve expeditiously the issue of Rett Syndrome. The special master rejected the suggestion even though respondent proposed that petitioner choose the doctor to perform the second IME from a list of three pediatric neurologists chosen by Drs. Trauner and Haas and even though respondent would have committed to stand by the second doctor's IME, despite any reluctance on petitioner's part to make a similar commitment.

■ The special master grounded her finding of undue prejudice on the limitation of recoverable medical expenses to those incurred post-judgment. While some monetary prejudice would be suffered, had trial of the causation issue lengthened the hearing or the decisionmaking process, it is not undue. The amount of the one-time pay-

ment and yearly annuity show that Jenna's monthly expenses at the time did not exceed $3,200.00. In fact, the record does not disclose how long the proceedings might have extended, so that there is no basis for quantifying any delay beyond a minimum of one month. A court may take into consideration severe consequences that will result to the moving party when ruling on a motion for leave to amend. Respondent's obligation for compensation depended directly on the evidence sought to be introduced through the motion for leave to amend. Respondent was the party facing the graver prejudice. The vaccine program operates at an accelerated schedule with limited discovery rights. However, the Act does not abrogate the principle that leave to amend should be allowed unless the non-moving party can show undue delay or undue prejudice.

■ Although respondent has shown that the special master's grounds for denying its motion based on delay and prejudice were clearly unreasonable, the result reached by the special master should stand because petitioner has shown that granting leave to amend would have been futile.[2] Petitioner made that showing before the special master. *See supra* note 2. Petitioner also made that showing before this court based on the medical literature that respondent submitted with its motion for review in the Claims Court.

Section 300aa–13(a) of the Vaccine Act sets forth as a "[g]eneral rule":

**2.** Petitioner argued before the special master that allowing the amendment would be futile. Resp.'s Br. filed Nov. 26, 1990, at 6–7. The special master included this criterion in her discussion of prejudice:

> Where as here, respondent has all the information it needed prior to filing its report that the issue of Rett syndrome should perhaps be revisited, but chose to ignore it (or simply was careless in its review of the case), where respondent had an automatic 30 day suspension available to it if it wished to inquire further, and particulary where, as here, a diagnosis of Rett syndrome is neither confirmed nor a clear-cut alternative cause,[18] any prejudice resulting from its inability to withdraw a concession should inure to the detriment of respondent, not petitioner.

> 18. There is substantial support for the notion that where a table injury has been proven by a preponderance of the evidence, the resulting presumption of causation is strong enough to overcome the suggestion of alternative causation unless the etiology of the "unrelated factor" is known. *See e.g., Grant v. Secretary of HHS,* No. 88–70 [1990 WL 293410] (Cl.Ct.Spec.Mstr. July 13, 1990); *Alger v. Secretary of HHS,* No. 89–31V [1990 WL 293408] (Cl.Ct.Spec.Mstr. March 14, 1990); *Veon v. Secretary of HHS,* No. 89–102V [1990 WL 293378] (Cl.Ct.Spec.Mstr. September 14, 1990).

> *Koston,* slip op. at 8–9 & n. 18 (footnote omitted).

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

    (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

    (B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

(2) For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—

    (A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and

    (B) may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

*Dorland's Illustrated Medical Dictionary* describes Rett syndrome as "a progressive disorder affecting the gray matter of the brain, occurring exclusively in females and present from birth; it is characterized by autistic behavior, ataxia, dementia, seizures, and loss of purposeful use of the hands, with cerebral atrophy, mild hyperammonemia, and decreased levels of biogenic amines." *Dorland's Illustrated Medical Dictionary*, 1642 (27th ed. 1988). Respondent submitted this definition.

One of the articles submitted by respondent explains that in 1966 a pediatrician from the University of Vienna, Andreas Rett, thoroughly described the clinical characteristics of Rett Syndrome in German literature. *See* Hagberg, *Rett Syndrome: Clinical Peculiarities, Diagnostic Approach, and Possible Cause,* 5 Pediatr. Neurol. 75 (1989) (hereafter "Hagberg"). Dr. Rett's research went unnoticed outside of Austria and Germany for 17 years. In 1983 a combined publication by French, Portuguese, and Swedish doctors raised the interest in and awareness of the syndrome to the world medical community. Rett Syndrome is found in all races of people.

Another article submitted by respondent characterizes the natural course of Rett syndrome as a four-stage system. Oldfors, Hagberg, Nordgren, Sourander, & Witt-Engerstrom, *Rett Syndrome: Spinal Cord Neuropathology,* 4 Pediatr.Neurol. 172 (1988) (hereafter "Oldfors"); *accord* Hagberg at 76–77. Oldfors describes the stages in the following manner:

Developmental "stagnation" (stage I) appears between 6–18 months ... of age and is followed by a period of "deterioration" (stage II), with loss of acquired skills lasting 6 months to 3 years. During this latter stage apraxia, severe dementia, and autistic traits appear. State III, which continues for several years, is a period of "pseudo-stationary" multi-impairment. The autistic traits diminish but the girls are severely mentally retarded. Epilepsy appears in about 75% of patients. The neurologic examination is characterized by gait apraxia-ataxia, mild to moderate limb weakness, and slight spastic signs. Stage IV is the period of "wheelchair" dependence.... This stage continues for decades. The majority of RS [Rett syndrome] patients survive far into middle age.

Oldfors at 172.

The origins of Rett Syndrome have yet to be discovered. Dr. Hagberg's article stated that Rett syndrome involves "unsolved questions perplexing investigators worldwide...." Hagberg at 75. Hagberg continued his article using language that shows the medical community's lack of understanding of the causes of Rett Syn-

drome, such as "possible origin;" "unknown reasons;" "[a]t present, the cause does not appear to be found within any of the following groups....;" and "[t]hese are open questions and wild speculations in a stage of complete causal mystery." *Id.* at 75, 81, 82. Drs. Trauner and Haas, in the third of respondent's articles, have stated, "Rett Syndrome is a progressive, neurologic disorder of unknown cause that has been described only in girls." Trauner & Haas, *Electroencephalographic Abnormalities in Rett Syndrome*, 3 Pediatr.Neurol. 331 (1987) (hereafter "Trauner and Haas"). Dr. Hagberg noted in his article, "There is no known biologic marker for RS. Research should be focused on well-defined clusters of developmental and clinical deviations characteristic of RS." Hagberg at 76. Doctors have been researching into causal connections between Rett syndrome and biochemical and genetic effects. Researchers obtained conflicting results when testing a theory of biochemistry that Rett syndrome is caused by a developmental monoamine deficiency disorder. *Id.* at 80. Drs. Trauner and Haas reported that research has not yet been able to identify a specific metabolic defect as the cause for the symptoms of Rett Syndrome. Trauner and Haas at 333. Other researchers are studying possible genetic causes for the disease, but so far none have been identified as satisfactorily fulfilling the role of causation. *Id.* Thus, respondent itself submitted articles that show the cause of Rett Syndrome to be "unknown" and possibly "idiopathic." The Vaccine Act does not permit such conditions to be advanced as causes of Jenna's condition. § 300aa–13(a)(2)(A).

Respondent subscribes to the view that Rett Syndrome is a genetic disease and points to a discussion of findings in Dr. Hagberg's article by other medical evaluators to the effect that Rett Syndrome "has been suspected but not established as a genetic disease." Hagberg at 80. Even if the observation were considered as establishing a difference of opinion within the medical community, respondent plausibly could not sponsor Rett Syndrome as a "[factor] unrelated to the administration of the vaccine" under section 300aa–13(a)(1)(B). As petitioner points out, subsection 13(a)(2)(B) defines these factors to include infection, toxins, trauma, or metabolic disturbances shown "to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death." The medical literature accompanying respondent's motion reveals that there are no known agent or agents that cause Rett Syndrome.[3]

 The court's ruling is narrow. When a party challenges the denial of a motion for leave to amend, and concurrently submits information casting substantial doubt on its ability to prevail on its own claim or defense, the denial of the motion will be upheld as reasonable. For these reasons the court concludes that leave to amend would be an *"apparent* futility." *Mitsui Foods,* 867 F.2d at 1404 (emphasis in original).

## CONCLUSION

Accordingly, based on the foregoing, the decision of the special master is sustained. The Clerk of the Court shall enter judgment in accordance with the recommended decision.

---

3. During argument before this court, respondent's counsel requested leave to file a reply brief addressing the issue whether Rett Syndrome is an unknown or idiopathic illness or condition. This court denied the request as untimely. Respondent, not petitioner, raised the issue in the materials appended to its motion. Therefore, the issue was not new to petitioner's response, which would have entitled respondent to reply. Having reviewed petitioner's response, respondent nonetheless could have sought leave to file a reply before argument, but did not do so. Moreover, respondent's counsel conceded that she did not have available without further investigation articles that would have disputed the assertions of the doctors who authored the articles that she already had submitted. Allowing this late request to file materials that may or may not exist would have run athwart the requirement for expeditious disposition found in section 300aa–12(d)(3)(A)(ii) of the Act and would have been inappropriate under Claims Court practice, as well. RUSCC 1(a)(2).